E-FILED
Tuesday, 06 August, 2019  04:43:13 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **GIRALDO ROSALES, MELVIN BOATNER, ADRIAN FLOWERS, and FRANK MCCURRY,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 19-CV-2021** |
| **UNIVERSITY OF ILLINOIS, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, HEIDI JOHNSON, MAUREEN BANKS, CHAD GARRETT, and MARK BARCUS,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## <u>ORDER</u>

On May 6, 2019, Plaintiffs filed a four-count Amended Complaint (#11) against Defendants.  On May 20, 2019, Defendants filed a Motion to Dismiss (#14).  Plaintiffs filed a Response (#17) on June 3, 2019, and a Corrected Response (#19) on June 17, 2019.[1]  For the following reasons, Defendants' Motion to Dismiss is granted in part and denied in part.

## I.  BACKGROUND

Plaintiffs, Giraldo Rosales, Melvin Boatner, Adrian Flowers, and Frank McCurry, are current and former employees of the University of Illinois who allege that Defendants the University of Illinois and the Board of Trustees of the University of

---

[1]The Corrected Response added a signature block, but did not otherwise change the Response (#17).

Illinois ("University Defendants"),[2] and University employees, discriminated against them on the basis of race, and retaliated against them for engaging in protected activity. Defendants Heidi Johnson, Maureen Banks, Chad Garret, and Mark Barcus ("Individual Defendants") each supervised one Plaintiff. The Amended Complaint contains the following allegations.

Factual Allegations

*Giraldo Rosales*

Rosales, who is Black,[3] of Cuban national origin, worked for the University for almost thirty years. He was classified as an "Academic Professional." That category of employees are non-union, work on annual contracts renewed prior to the Fall Semester, and are evaluated, promoted, given raises, and disciplined based on a subjective merit system that turns on their immediate supervisor's opinions. At the times relevant to his claims, Rosales worked for the Office of Diversity, Equity and Access ("ODEA") and Defendant Heidi Johnson was his supervisor.

In 2014, Rosales was passed over for a promotion while three substantially similar white workers were promoted in title or received salary increases. In response, Rosales filed an EEOC charge complaining of racial discrimination and retaliation.

---

[2]Defendants state that the appropriate legal entity is "The Board of Trustees of the University of Illinois."

[3]The Amended Complaint refers to Plaintiffs and other University employees at different points as "Black" and as "African American." The Amended Complaint's allegations will be summarized using the language used in the Amended Complaint.

In December 2016, Rosales was denied a promotion, and instead demoted, because of his race and color.  He was pressured to resign his position and accept a lesser position while a white colleague, Tracy Kleparski, was not so targeted.  His new position was not on a promotion track and had no ability to increase salary, except for annual merit awards.  Johnson made these decisions.

Also in December 2016, Rosales applied for a position as Assistant Director of Facilities & Services, which was nearly identical in duties and qualifications to a job he formerly held, but the position was opened and closed three times "ostensibly because no suitable candidate was identified," even though Rosales fit its requirements.

Between 2014 and 2017, after his initial EEOC complaint, Rosales made several complaints to human resources and University leadership regarding racially discriminatory treatment and the atmosphere of racial discrimination at the University. During this time, Johnson excessively scrutinized his work, calling him in for sudden meetings about it and belittling his work in front of coworkers.

On January 20, 2017, Rosales sent a letter to Assistant Provost of Administrative Affairs Sharon Reynolds, protesting continued discriminatory treatment by Johnson. He detailed Johnson's discriminatory and retaliatory treatment of him, which included publicly "dressing him down" in front of his colleagues, and he asked for a meeting to discuss, as he stated in the letter, "forms of retaliation, discrimination and [conduct] not according to the University's professional code of conduct."

On January 23, 2017, Rosales met with Reynolds.  He learned that his complaints about his differential treatment had not been included in his personnel file.  No remedial action resulted.

In March of 2017, Johnson denied Rosales a merit-based pay increase.  A white colleague in Rosales' department, with similar work performance, received merit pay increases.

On May 18, 2017, Rosales filed an EEOC charge alleging discrimination and retaliation for his opposition to his discriminatory treatment.  After that charge, Johnson retaliated against Rosales through increased scrutiny, belittling and insulting behavior, and negative performance reviews which impacted his ability to secure merit raises and promotions.  Johnson told Rosales that she "couldn't 'understand' him and that his demeanor was overly demonstrative."  She said he was overly demonstrative in his manner of speech, and questioned his ability to relate to the "majority population" of the university–meaning the white student body and employees.  She characterized him as "aggressive" and "made numerous comments showing racial animus."

Johnson began excluding Rosales from critical training programs to which his white coworkers had access.

Leading up to an August 1, 2017 performance evaluation, Johnson requested weekly meetings to discuss Rosales' performance, but she cancelled many of them and failed to give him any specific areas of needed improvement.

The August 2017 performance review was by far the worst performance review Rosales had ever received in his 27 years with the University, with the lowest possible

4

rating in every area.  He received a "not acceptable" rating, despite his self-assessment laying out the number of ways he had remained engaged and achieved objectives, including specific accomplishments such as professional development training, implementing a new database system, initiatives to engage with community institutions and organizations to improve diversity and recruitment, and documentation of efforts to increase diversity.  Johnson recommended non-renewal of Rosales's contract, amounting to a constructive discharge that would take effect in August of 2018.

On August 28, 2017, Rosales wrote to University Chancellor Robert Jones, detailing his treatment by Johnson, the irregular performance review of August 2017, and its retaliatory nature as it took place soon after an EEOC charge.  He asked for remedial action to prevent further retaliation and discrimination by Johnson and in his department, and for a new evaluation and re-appointment.  Jones did not respond.

*Melvin Boatner*

Boatner, who is African American, has worked for the University for over fifteen years as Associate Director of Employee Relations, with responsibility for the Facilities & Services Department.  As a human resources professional, he has advocated for employees facing discriminatory conduct.  Over the last five years he raised concerns about incidents of racial harassment and intimidation, including employees finding nooses and the use of racial slurs.  Dr. Maureen Banks was his supervisor, and the director of safety for his department.

On August 19, 2014, Boatner submitted a complaint of racial discrimination against Curt Taylor, concerning Taylor's racial animus in the decision to deny Nicole

McCurry, a Black woman, a promotion to an open position.  Taylor had previously promoted white applicants.

After this complaint, Boatner faced retaliatory employment actions.  Diminishing his responsibilities, he was asked to recuse himself from candidate search procedures involving African American candidates, while white colleagues evaluating white candidates were not asked to recuse themselves.

In February of 2016, Banks passed over Boatner for a merit raise while all of his colleagues (including all of his white colleagues) received raises.

In January of 2017, Boatner sent a complaint to the University administration complaining of disparate treatment based on racial discrimination, resulting in retaliation.  In February of 2017, he was given the lowest raise in his department while all of his white colleagues received higher raises.

In May of 2017, Boatner filed an EEOC charge of racial discrimination in the form of disparate pay, treatment, and promotion, hostile work environment, and retaliation. He then began to receive reprimands and negative performance reviews, and his supervisors, including Banks, pressured him to stop raising complaints to the University leadership.  He was subjected to increased scrutiny and warnings from Banks and other supervisors against continuing to oppose discriminatory practices.

In August of 2017, Boatner submitted complaints of the racially discriminatory atmosphere to the Chancellor.  Also that month, he received a negative evaluation by Banks, and letter of expectations threatening termination through non-reappointment if Banks did not see improvement within sixty days.  The negative evaluation letter also

6

revoked Boatner's right to work from home on limited days during the week.  Boatner

lives three hours' driving distance from the University, and had been allowed to

telecommute some days for approximately ten years.

In late August, Boatner wrote to the Chancellor about that evaluation and letter

of expectation.  No remedial action followed.  Around this time, Eric Smith, who

assisted Banks with employment issues, asked Boatner "where he was going to work" if

he "continued to complain."

About three months later, Boatner suffered from a stroke and collapsed in a staff

meeting.  Banks, who had left the meeting, returned to the room and told Boatner, "You

know, if you aren't' feeling well, you can go home" and Smith said "he seems coherent,

he must be okay."  Another supervisor, Coleman, did not check on Boatner.  She sent

her assistant instead.  Boatner was unaware that he had suffered a stroke because no

medical attention was provided.  He suffered damage as a result of the lack of treatment

after this stroke.  He later asked Smith and Coleman why they did not offer him

assistance, and Coleman said she did not believe his version of events.

In the fall of 2018, Boatner applied for a new position, which would have been a

promotion.  The Executive Director, Mohamed Attala, denied him the promotion.

Attala knew of Boatner's EEOC charge and complaints of discrimination.

*Adrian Flowers*

Flowers, who is African American, was a groundskeeper in the Facilities &

Services Department from August 2007 to August 2012, and in the Grounds Keeping

Department from March 2014 to present.  His supervisor was Chad Garrett.

7

Beginning in 2007, Flowers raised concerns with his supervisors about disparate access to tools and training for Black groundskeepers.  He sent complaints to HR about the practice of failing to promote Black groundskeepers.

In April 2016, Flowers found another employee by his desk, twirling a noose. Flowers complained about the incident with a notice sent to the Human Resources department.

In the next year, Flowers was denied opportunities at better-paid upgrade work and promotions, despite having top civil service exam scores.  In July 2016, white colleagues received opportunities for upgrades (promotion) but Flowers did not. Garrett made those decisions.  Flowers complained about being passed over for promotion in 2016 and 2017, and was denied upgrades and potential pay increases.

*Frank McCurry*

McCurry, who is African American, has worked as a carpenter in the Facilities & Services Department for about twenty years, receiving favorable evaluations including employee of the month and employee of the year.  Mark Barcus was his supervisor.

In April 2015, McCurry applied for a position as Supervisor of Building Craftsmen.  He scored 100% on the civil service examination (and was the only African American to do so).  That score would typically entitle an applicant to an interview. However, when McCurry showed up for his interview, Barcus made an arbitrary change to the hiring process and made him take a written evaluation instead of interviewing him.  McCurry complained about this change to human resources.

In June 2015, McCurry was given his first ever negative performance evaluation.

8

In July 2015, McCurry filed an EEOC complaint regarding this discriminatory and irregular hiring process.

In April 2016, McCurry complained to Human Resources employee Elynn Cole that he and other Black employees in the Facilities & Services department were not given opportunities for promotion and upgrades, and the associated pay increases, at a rate similar to that of white colleagues.  No steps were taken to address those issues.

In the fall of 2016, McCurry was transferred to a different "home group" by his supervisor.  The transfer effectively denied him upgrade work which would have been supervisory and better paid.  McCurry's supervisor made no promotions or upgrades of any Black employees during this period, but he gave upgrades to two white colleagues in late Fall and Winter of 2016/2017.

After McCurry complained of discrimination, Barcus denigrated his knowledge and targeted him, telling him he "did not know his job."  He applied to a Supervisor position with greater responsibility and pay, but was denied.

Legal Claims

The Amended Complaint contains ten counts.

*Retaliation (All Plaintiffs)*

Counts I, II, and III allege retaliation.  These Counts allege that Plaintiffs engaged in protected activity, by opposing discriminatory practices and making complaints of discrimination to University leadership and to the EEOC, and that they suffered adverse employment actions as a result.

Count I is brought by all four Plaintiffs, against the University Defendants, under 42 U.S.C. 2000(e) (Title VII).

Count II is brought by all four Plaintiffs, against the Individual Defendants, under 42 U.S.C. § 1983.

Count III is brought by all four Plaintiffs, against all Defendants, under the Illinois Civil Rights Act, 740 Ill. Comp. Stat. 23 *et seq.* ("ICRA").

*Disparate Treatment-Failure to Promote (Rosales, Flowers, McCurry)*

Counts IV, V, and VI allege disparate treatment in the form of failures to promote Rosales, Flowers, and McCurry. These counts allege that Defendants discriminated against those Plaintiffs by failing to promote them because of their race, color, and national origin, and that Defendants failed to promote them while promoting their similarly situated white colleagues.

Count IV is brought against the University Defendants, under Title VII.

Count V is brought under 42 U.S.C. § 1983. The title of Count V states that it is brought against the Individual Defendants, but the body of the count states: "This Count is brought against the University Defendants and the individual defendants in their official capacity."

Count VI is brought against the University Defendants, under the ICRA.

*Disparate Treatment-Pay Raises (Boatner and Rosales)*

In Counts VII, VIII, and IX, Boatner and Rosales allege disparate treatment in the form of denials of pay raises. These Counts allege that Boatner and Rosales were

discriminatorily denied raises while similarly situated white colleagues received raises, or larger raises, than them.

Count VII is brought against the University Defendants, under Title VII.

Count VIII is brought against all Defendants, under 42 U.S.C. § 1983.

Count IX is brought against the University, under the ICRA.

*Failure to Train (Rosales)*

Count X is brought by Rosales, against the University Defendants, under Title VII.  It alleges that the University Defendants and their agents denied him training because of his race, color, and national origin while similarly situated white colleagues received the training that he was denied.

## II.  ANALYSIS

Defendants make numerous arguments as to why all of the Plaintiffs' claims must be dismissed.  They make separate arguments concerning four categories of claims: the § 1983 claims, the retaliation claims, the Title VII claims, and the ICRA claims.

### Section 1983 Claims (Counts II, V, and VIII)

First, Defendants argue that Plaintiffs' claims under § 1983 (Counts II, V, and VIII) must be dismissed.  Defendants argue that Plaintiffs fail to adequately allege the Individual Defendants' personal involvement in any deprivation of a constitutional right, and that sovereign immunity bars the § 1983 claims against the University in Count VIII.

*Personal Involvement*

The court will first examine the argument about Individual Defendants' alleged personal involvement as pertains to the § 1983 counts which sue the Individual Defendants in their individual capacities: Counts II and VIII.[4]  Defendants argue that Plaintiffs fail to adequately allege the Individual Defendants' personal involvement in any deprivation of a constitutional right in that "no Plaintiff has identified a single display of discriminatory or retaliatory animus on the part of any Individual Defendant."

A plaintiff may bring a § 1983 claim based on racial discrimination in violation of the Equal Protection Clause.  *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013).  Such § 1983 race discrimination employment claims are analyzed under the same standards as Title VII claims.  *Id.* at 635, citing *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011).  However, for § 1983 claims and not for Title VII claims, "conclusory allegations of the causative link are not sufficient, instead plaintiff must offer 'facts that might plausibly support the discriminatory intent link.'"  *Stone v. Bd. of Tr. of N. Ill. Univ.*, 38 F. Supp. 3d 935, 948 (N.D. Ill. 2014) quoting *Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832-33 (7th Cir. 2012).

---

[4]Count V states "This Count is brought against the University Defendants and the individual defendants in their official capacity," so the court will analyze it as a part of the sovereign immunity argument.  See  *Ind. Protection and Advocacy Serv. v. Ind. Family and Soc. Serv. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010) (Eleventh Amendment "bars actions in federal court against . . . state officials acting in their official capacities."

In Count II, all four Plaintiffs allege retaliation claims against the Individual Defendants.  "To make out a claim of retaliation under . . . Title VII, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two."  *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017).[5]  Under the Amended Complaint's allegations, as summarized above in section I, each Plaintiff offers facts that might plausibly support his supervisor's intent to retaliate and a causal connection between a protected activity and an adverse employment action.  Count II will not be dismissed.

In Count VIII, Boatner and Rosales bring disparate treatment claims, for denials of pay raises, against all Defendants.  Defendants Garret and Barcus had nothing to do with Boatner and Rosales.  They are therefore dismissed from Count VIII.  However, Boatner offers facts that plausibly support the discriminatory intent of Banks, and Rosales offers the same for Johnson.  As to Banks and Johnson, Count VIII will not be dismissed.

*Sovereign Immunity*

Defendants also argue that sovereign immunity bars the § 1983 claims against the University in Count VIII, in which Rosales and Boatner bring a disparate treatment claim for discriminatory pay raises against all Defendants.  The same arguments apply

---

[5]"The statute of limitations for Section 1983 claims in Illinois is two years." *Ramirez v. City of Chi.*, 2009 WL 1904416, at *2 (N.D. Ill. July 1, 2009).  So, the retaliation claims must concern conduct occurring on or after August 21, 2015, two years prior to a tolling agreement between the parties.  Prior acts may, however, provide relevant background.

to Count V's § 1983 claims against the University and the Individual Defendants in their

official capacities.

If properly raised, the Eleventh Amendment "bars actions in federal court

against a state, state agencies, or state officials acting in their official capacities." *Ind.*

*Protection and Advocacy Serv. v. Ind. Family and Soc. Serv. Admin.*, 603 F.3d 365, 370 (7th

Cir. 2010). It protects state universities and their governing bodies from suit. See

*Cannon v. Univ. of Health Sciences/The Chi. Med. Sch.*, 710 F.2d 351 (7th Cir. 1983);

*Kaimowitz v. Bd. of Tr. of the Univ. of Ill.*, 951 F.2d 765, 767 (7th Cir. 1991); *Mutter v.*

*Madigan*, 17 F. Supp. 3d 752, 757-58 (N.D. Ill. 2014).

Eleventh Amendment immunity is not absolute immunity. *Council 31 of the Am.*

*Fed'n of State, Cty. and Mun. Employees, AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir.

2012). This means that states, their agencies, and their officials acting in their official

capacities can be sued in federal court under some limited circumstances. *Id.*

Specifically, there are three exceptions to the defense of sovereign immunity that may

subject a state to an action in federal court: (1) where Congress, acting under its

constitutional authority, abrogates immunity; (2) where a state consents to being sued

in federal court; and (3) under the doctrine articulated by the Supreme Court in *Ex parte*

*Young*, 209 U.S. 123 (1908). *Id.*

The *Ex parte Young* doctrine allows private parties to sue individual state officials

for prospective relief to enjoin ongoing violations of federal law. *Id.* The doctrine bars

actions for damages. *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*, 1998 WL 156678, at *9 (N.D.

Ill. March 31, 1998).  To determine whether the *Ex parte Young* exception applies, a court must "conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Council 31*, 680 F.3d at 882 (internal quotations and citations omitted).

Defendants properly raised the Eleventh Amendment issue in their Motion to Dismiss.  Congress did not abrogate sovereign immunity when enacting § 1983, and Illinois has not consented to suit in federal court for such claims.  *Rao v. Gondi,* 2017 WL 4215889, at *2 (N.D. Ill. Jan. 11, 2017).  The § 1983 claims against the University Defendants in Counts V and VIII are barred by the Eleventh Amendment, as are the claims in Count V for damages against the Individual Defendants in their official capacity.  To the extent that Plaintiffs in Count V seek prospective injunctive relief against the Individual Defendants in their official capacity, they may continue to do so.

Defendants also argue that, under the doctrine of sovereign immunity, Plaintiff cannot sue the Individual Defendants in their individual capacities.  Defendants cite *Tanner v. Board of Trustees of University of Illinois*, 2018 WL 1161140, at *8 (C.D. Ill. March 5, 2018).  The *Tanner* court stated:

> [A]n individual capacity suit is barred by sovereign immunity when the claim is really and substantially against the State.  An individual capacity lawsuit is substantially against the State when the judgment would result in the judgment being paid by the State rather than the individual defendants, such as where the plaintiff seeks backpay and other monetary compensation based on an employment contract.

*Tanner*, 2018 WL 1161140, at *8 (internal citations and quotations omitted).

15

However, *Tanner* declined to dismiss § 1983 individual capacity damages claims at the motion to dismiss stage, finding that some damages did not stem from the plaintiff's employment contract with a university. *Id.* at *9. Here, like in *Tanner*, the court cannot at this early stage dismiss the § 1983 individual capacity claims. The § 1983 individual capacity claims in Counts II and VIII may proceed.

Retaliation Claims (Counts I, II, and III)

Defendants argue that Plaintiffs' retaliation claims, Counts I, II, and III, fail to state a claim.

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the complaint, *not* to decide the merits of the case. See *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). The complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 832 (7th Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). This requirement is meant to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When ruling on a motion to dismiss, a court must accept, as true, all factual allegations contained within the complaint. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss for failure to state a claim, the complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests'"; and (2) "its allegations must plausibly suggest that the

defendant has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Defendants argue that Plaintiffs' retaliation claims fail to state a claim because the protected conduct occurred well before any adverse actions, and some allegations do not qualify as material adverse actions or protected activity.

The court finds that the Amended Complaint's allegations, as summarized above in Section I, sufficiently state retaliation claims. Defendants' arguments may be "revisited, if and as appropriate, at a later stage in the litigation when an appropriate factual record has been assembled and when the applicable procedural rules permit more fulsome and searching analysis." See *Access 4 All, Inc. v. Chi. Grande, Inc.*, 2007 WL 1438167, at *1 (N.D. Ill. May 10, 2007).

Title VII Claims (Counts I, IV, VII, and X)

Defendants argue that some Title VII claims were not exhausted, and that Plaintiffs fail to state plausible claims for discrimination in Counts I, IV, VII, and X.

*Exhaustion*

Defendants argue that some Title VII claims were not exhausted. Filing a charge with the Equal Employment Opportunity Commission (EEOC), in order to exhaust administrative remedies, is a prerequisite to bringing a Title VII action in federal court. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 715 (7th Cir. 2009). Title VII claims cannot be pursued in federal court unless they could reasonably be expected to grow from

administrative charges filed by a plaintiff.  *Moore v. Allstate Ins. Co.*, 928 F. Supp. 744,

749 (N.D. Ill. 1996).  A Title VII lawsuit may properly encompass any discrimination

like or reasonably related to the allegations of the charge and growing out of such

allegations.  *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976).

All four Plaintiffs filed EEOC charges, which the court will examine to determine

whether the Title VII allegations in the Amended Complaint are like or reasonably

related to the allegations of the charge or grow out of such allegations.

In the Amended Complaint, Rosales brings three claims under Title VII.  He

alleges disparate treatment through failure to promote (Count IV) and disparate pay

raises (Count VII), as well as a failure to train (Count X).  Rosales alleged in his EEOC

charge that he was demoted, denied promotions, and given disparate pay raises or

denied pay raises because of his race and color, and that he was treated differently

because of his race.  His Title VII disparate treatment claims for failure to promote

(Count IV) and disparate pay raises (Count VII) were exhausted.  His EEOC charge did

not specifically mention denial of training.  However, that claim is sufficiently like or

reasonably related to the allegations in the charge that he may also continue to pursue

his Title VII claim concerning failure to train (Count X).

In the Amended Complaint, Boatner brings one claim under Title VII: disparate

treatment through disparate pay raises (Count VII).  Boatner alleged in his EEOC charge

that the University denied him raises, gave him smaller raises, and deprived him of

18

opportunities for promotion relative to similarly situated white workers.  His Title VII disparate treatment claim for disparate pay raises (Count VII) was exhausted.

In the Amended Complaint, Flowers brings one claim under Title VII: disparate treatment through failure to promote (Count IV).  Flowers alleged in his EEOC charge that the University denied him promotions, resulting in pay disparities, relative to white workers.  McCurry alleged that he was denied a promotion because of his race.  His Title VII disparate treatment claim for failure to promote (Count IV) was exhausted.

In the Amended Complaint, McCurry brings one claim under Title VII: disparate treatment through failure to promote (Count IV).  McCurry alleged in his EEOC charge that he consistently experienced differential treatment because of his race, including in pay and promotions.  He and other African American coworkers were deprived of overtime opportunities and denied upgrades to higher paying positions for which they were eligible while white workers disparately received overtime hours and upgrades, resulting in racial pay disparities.  His Title VII disparate treatment claim for failure to promote (Count IV) was exhausted.

*Failure to State a Claim*

Defendants argue that Plaintiffs' Title VII discrimination claims fail to state a claim because they do not sufficiently allege facts concerning adverse actions and they do not sufficiently link adverse actions to race.

 "A complaint alleging race discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of

his race." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 633 (7th Cir. 2013) (internal quotations and citations omitted).  The Seventh Circuit has repeatedly held "that a plaintiff alleging employment discrimination under Title VII may allege these claims quite generally." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

The court finds that Plaintiffs' allegations, as summarized above in Section I, sufficiently state Title VII discrimination claims.  Again, Defendants' arguments may be "revisited, if and as appropriate, at a later stage in the litigation when an appropriate factual record has been assembled and when the applicable procedural rules permit more fulsome and searching analysis." *Access 4 All, Inc.*, 2007 WL 1438167, at *1.

ICRA Claims (Counts III, VI, IX)

Lastly, Defendants argue that Plaintiffs' ICRA claims must be dismissed. Plaintiffs bring three claims under the ICRA: retaliation (Count III), disparate treatment for failure to promote (Count VI), and disparate treatment in the form of disparate pay raises (Count IX).

Defendants argue that the ICRA claims fail for the same reasons as their Title VII claims (except that the failure-to-exhaust arguments do not apply).  The court already concluded that the Title VII claims should not be dismissed, so those arguments are not successful as applied to the ICRA claims, either.

Defendants also argue that the ICRA is a disparate impact statute not designed for intentional claims.  Defendants cite *Warr–Hightower v. Illinois Central College*, 2017 WL 5484671, at *9 (C.D. Ill., Nov. 15, 2017).  However, in that case, the court found that

the plaintiff did state an ICRA race discrimination claim, based on allegations that

"Defendants denied her two promotions based on her race, African American, and

hired a less-qualified white individual for both positions." *Warr–Hightower*, 2017 WL

5484671, at *9.  The court stated:

> Thus, the analysis is the same for [plaintiff's] racial discrimination claims
> under Title VII and ICRA. *See McFadden v. Bd. of Educ. For Ill. Sch. Dist.
> U–46*, No. 05–7640, 2006 WL 6284486, *8 (N.D. Ill. Oct. 3, 2006) (To state a
> prima facie claim under ICRA, plaintiff must allege that defendant treated
> the plaintiff differently because of her inclusion in an identifiable and
> constitutionally protected class); *Hosick v. Chicago State Univ. Bd. of
> Trustees*, 924 F.Supp.2d 956, 966 (N.D. Ill. 2013) (analyzing Title VII and
> ICRA claims together).

*Id.*, at *8.

Defendants also cite *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010).

That case concerned a disparate impact claim, but the court fails to see how it limited

ICRA claims to *only* disparate impact claims.  The *Cerpa* court noted that "[the ICRA]

merely created a new venue in which plaintiffs could pursue in the State courts

discrimination actions that had been available to them in the federal courts," *Cerpa*, 696

F. Supp. 2d at 964.  That statement does not indicate that the ICRA limited the types of

federal discrimination claims Plaintiffs could pursue under it to disparate impact claims

only.

Plaintiffs may continue to pursue their ICRA claims.

IT IS THEREFORE ORDERED THAT:

(1) The Defendants' Motion to Dismiss (#14) is granted in part and denied in part.  Defendants Garret and Barcus are dismissed from Count VIII.  The claims against the University Defendants in Counts V and VIII are dismissed.  The claims in Count V for damages against the Individual Defendants are dismissed, but any claims for prospective injunctive relief against the Individual Defendants in Count V remain.  All other claims remain.

(2) This case is referred to Magistrate Judge Eric I. Long for further proceedings.

ENTERED this 6th day of August, 2019.

s/Colin S. Bruce
U.S. DISTRICT JUDGE